# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| NAVEN L.,[1] | : | Case No. 2:25-cv-00937 |
| Plaintiff, | : : | Chief District Judge Sarah D. Morrison |
| vs. | : : | Magistrate Judge Caroline H. Gentry |
| COMMISSIONER OF SOCIAL SECURITY, | : : : : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATION[2]

Plaintiff filed applications for Supplemental Security Income in August 2022 and for Disability Insurance Benefits in October 2022. Plaintiff's claims were denied initially and upon reconsideration. After a hearing at Plaintiff's request, the Administrative Law Judge (ALJ) concluded that Plaintiff was not eligible for benefits because he was not under a "disability" as defined in the Social Security Act. The Appeals Council denied Plaintiff's request for review. Plaintiff subsequently filed this action.

Plaintiff seeks an order remanding this matter to the Commissioner for the award of benefits or, in the alternative, for further proceedings. The Commissioner asks the Court to affirm the non-disability decision. For the reasons set forth below, the

---

[1] *See* S.D. Ohio General Order 22-01 ("The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that due to significant privacy concerns in social security cases federal courts should refer to claimants only by their first names and last initials.").

[2] *See* 28 U.S.C. § 636(b)(1). The notice at the end of this opinion informs the parties of their ability to file objections to this Report and Recommendation within the specified time period.

undersigned Magistrate Judge **RECOMMENDS** that the District Judge **REVERSE** the Commissioner's decision and **REMAND** for further proceedings.

## I.    BACKGROUND

Plaintiff asserts that he has been under a disability since May 31, 2022. At that time, he was twenty-one years old and was considered a "younger person" under the Social Security regulations. 20 C.F.R. §§ 404.1563(c), 416.963(c).[3] Plaintiff has a "high school education and above." 20 C.F.R. § 404.1564(b)(4).

The evidence in the Administrative Record ("AR," Doc. No.  7) is summarized in the ALJ's decision ("Decision," Doc. No. 7 at PageID 36-57), Plaintiff's Statement of Errors ("SE," Doc. No. 11), and the Commissioner's Memorandum in Opposition ("Mem. In Opp.," Doc. No. 12). Rather than repeat these summaries, the Court will discuss the pertinent evidence in its analysis below.

## II.    STANDARD OF REVIEW

The Social Security Administration provides Disability Insurance Benefits and Supplemental Security Income to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §§ 402, 423(a)(1), 1382(a). The term "disability" means "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a).

---

[3] The remaining citations will identify only the pertinent Disability Insurance Benefits Regulations, as they are similar in all relevant respects to the corresponding Supplemental Security Income Regulations.

This Court's review of an ALJ's unfavorable decision is limited to two inquiries: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."). "Unless the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence," this Court must affirm the ALJ's decision. *Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 849 (6th Cir. 2020). Thus, the Court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Id*.

"Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citation omitted). This limited standard of review does not permit the Court to weigh the evidence and decide whether the preponderance of the evidence supports a different conclusion. Instead, the Court is confined to determining whether the ALJ's decision is supported by substantial evidence, which "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (citation omitted). This standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986). Thus, the Court may be required to affirm the

3

ALJ's decision even if substantial evidence in the record supports the opposite conclusion. *Key v. Callahan,* 109 F.3d 270, 273 (6th Cir.1997).

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009). "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Id.* (citations omitted). Such an error of law will require reversal even if "the outcome on remand is unlikely to be different." *Cardew v. Comm'r of Soc. Sec.*, 896 F.3d 742, 746 (6th Cir. 2018) (internal quotations and citations omitted).

## III.    FACTS

### A.    The ALJ's Factual Findings

The ALJ was tasked with evaluating the evidence related to Plaintiff's applications for benefits. In doing so, the ALJ considered each of the five sequential steps set forth in the Social Security regulations. *See* 20 C.F.R. § 404.1520. The ALJ made the following findings of fact:

Step 1:    Plaintiff has not engaged in substantial gainful activity since May 31, 2022, the alleged onset date.

Step 2:    He has the severe impairments of major depressive disorder/bipolar disorder, intermittent explosive disorder, borderline intellectual functioning, and an anxiety disorder.

4

Step 3:     He does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

Step 4:     His residual functional capacity (RFC), or the most he can do despite his impairments, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), consists of work at all exertional levels, subject to the following non-exertional limitations: "[H]e can perform simple tasks and maintain attention and concentration for at least two-hour segments. Work should not involve a fast production rate, such as fast assembly line pace; and should not involve more than occasional contact with others. He cannot engage in team or tandem work. He can adjust to occasional changes at the worksite."

He is unable to perform his past relevant work.

Step 5:     Considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that he can perform.

(Decision, Doc. No. 7 at PageID 41-52.) These findings led the ALJ to conclude that Plaintiff does not meet the definition of disability. (*Id.* at PageID 52-53.)

### B.      Intermittent Explosive Disorder

#### 1.      Disability reports and hearing testimony

Plaintiff alleges that he is disabled by several mental impairments, including an oppositional defiant disorder. (*See, e.g.,* AR, Doc. No. 7 at PageID 266-70, 275, 291-97, 304-09.)  In November 2022, Plaintiff said that his anxiety caused him to "just snap at people." (*Id.* at PageID 283.) Plaintiff's attorney argued at the July 2024 hearing that the combination of Plaintiff's intellectual disability and intermittent explosive disorder prevented him from keeping a job. (*Id.* at PageID 62.) Plaintiff testified during the hearing that he did not experience any "outbursts or anything like that" during his prior

5

factory job as a grinder.[4] (AR, Doc. No. 7 at PageID 68-69.) He also said that he had no difficulties getting along with other people in that job. (*Id.* at PageID 68.) However, Plaintiff stated that at his next job at a pizza restaurant, he forgot his job duties "almost all the time" and had "a few" anger outbursts.[5] (*Id.* at PageID 69-70.)

Plaintiff described his anger outbursts as follows: "I get real loud, and sometimes I'll punch the wall because I don't know what else to do with my anger. I have no clue where to direct my anger and what to do with it, so I just aim it at the closest wall. … I scream and yell." (*Id.* at PageID 78.) When asked what causes him to get upset, Plaintiff responded:

> It's mostly when people don't understand what I'm trying to, what I'm trying to say. When I'm getting yelled at. I'll try to explain it, but nobody will understand, so I just get more and more frustrated. Or if somebody, like, gives me an attitude for no reason, I'll give them an attitude back.

(*Id.* at PageID 78-79.) He said that he needed to go outside, go for a walk, listen to music, or play video games to calm down, and that it usually took "an hour or two" for him to do so. (*Id.* at PageID 79.) Plaintiff initially said these outbursts "[didn't] happen too often" and occurred "not as often as [they] used to." (*Id.* at PageID 79.) Upon questioning from his attorney, Plaintiff said the outbursts occurred "about maybe, maybe weekly." (*Id.*)

Plaintiff's mother also testified at the July 2024 hearing and described witnessing Plaintiff's outbursts. (AR, Doc. No. 7 at PageID 90-91.) According to Plaintiff's mother:

---

[4] Plaintiff worked as a grinder from August 2020 to November 2020, before the alleged disability onset date. (AR, Doc. No. 7 at PageID 313.)

[5] Plaintiff worked at Gibeye's Pizza from April 2021 to June 2022. (AR, Doc. No. 7 at PageID 313.)

> One minute he can be fine. The next minute he can, like, freak out and scream and yell. He'll wrestle with [Plaintiff's brother] sometimes and [Plaintiff's brother] will get made because of whatever because he's nine. … And then [Plaintiff] will get mad and like, we'll be going back and forth and I'm like, you know, he's nine and he'll be like, well, he – and he like, expects him to be more – he'll just start getting enraged and get angry and he'll scream and yell. But then on the other side of that, if he's scared of something, he'll – in front of me, he'll like, panic and sometimes he's gone into a ball and cried.

(*Id.* at PageID 90.) Plaintiff's mother stated that Plaintiff had anger outbursts "probably almost daily." (*Id.* at PageID 91.)

### 2.  Medical records

In July 2021, several months before the alleged disability onset date, Plaintiff visited primary care physician Matthew Fuerst, M.D. to follow up on his bipolar disorder. (AR, Doc. No. 7 at PageID 380.) Dr. Fuerst noted "Functional status – poor," but also noted that Plaintiff was "[t]aking [his medications] as directed with no complaints or side effects to report." (*Id.*)

Plaintiff's next documented medical visit was in August 2022, after the alleged disability onset date. (*Id.* at PageID 403.) Plaintiff visited Southeast Healthcare for a mental health assessment. (*Id.*) He complained of "escalating anger" and ongoing depression and anxiety. (*Id.*) Plaintiff rated his anxiety and anger levels at a ten out of ten (with ten being the highest), and said that he yelled, screamed, and punched walls when he was annoyed or irritated. (*Id.*) The provider documented a depressed, anxious, and irritable mood, a flat affect, a defensive and mistrustful attitude, slumped posture, intense eye contact, slowed behavior, impairment of attention and concentration, and minimal insight. (*Id.* at PageID 408-09.)

7

Plaintiff began outpatient therapy with Joseph Dunson, M.A., L.P.C.C. later that month. (AR, Doc. No. 7 at PageID 595.) Plaintiff complained of "significant anger and anxiety" that he was "experiencing regularly and struggle[d] to control." (*Id.*) Therapist Dunson documented a dysphoric mood and affect with fair judgment. (*Id.*) He also noted cooperative behavior, clear and coherent thoughts, and adequate insight. (*Id.*)

Joshua Louk, M.S., C.N.P. performed a psychiatric assessment in September 2022. (AR, Doc. No. 7 at PageID 386-94.) Plaintiff reported having "behavioral outbursts," which he described as "fail[ing] to control aggressive impulses, including both verbal aggression and physical aggression towards intimate [sic] objects." (*Id.* at PageID 390.) Nurse Louk noted the outbursts were "grossly out of proportion with the provocation" and that Plaintiff acknowledged the outbursts caused "interpersonal consequences." (*Id.*) Nurse Louk noted that Plaintiff was prescribed Lamotrigine and Doxepin but was "poorly adherent." (*Id.* at PageID 386.) Plaintiff acknowledged he had better impulse control when taking Lamotrigine. (*Id.*) He also reported that marijuana eased his symptoms. (*Id.*)

Nurse Louk conducted a mental status examination and documented anhedonia, an anxious and depressed mood, an inappropriate affect, and poor judgment. AR, Doc. No. 7 at PageID 388.) The other mental status findings were relatively normal and included appropriate behavior, a sufficient fund of knowledge, no fearfulness or forgetfulness, no increased activity, no memory loss, no mood swings, no obsessive thoughts or paranoia, normal insight, normal attention span and concentration, no pressured speech, and no suicidal ideation. (*Id.*) Nurse Louk diagnosed a major depressive disorder, cannabis dependence, and an intermittent explosive disorder. (*Id.*) Plaintiff acknowledged that his

8

medications were "working better now that he had been taking them regularly in the past few weeks." (*Id.* at PageID 388 (cleaned up).)

Later in September 2022, Plaintiff reported that he continued to struggle with "motivation, frustration, and other depressive symptoms." (AR, Doc. No. 7 at PageID 591.) In October 2022, Plaintiff stated that he was doing "alright" on his medications, and Plaintiff's mother reported that Plaintiff was "doing better" with the medications. (*Id.* at PageID 395.) But although Plaintiff denied depression, he reported frequent anxiety. (*Id.*) Nurse Louk's mental status examination documented anxiousness, an inappropriate and blunted affect, poor insight and judgment, a slowed response, and poor attention span and concentration. (*Id.* at PageID 397.) Nurse Louk renewed Plaintiff's Lamictal prescription and prescribed Vistaril. (*Id.*)

In November 2022, Plaintiff reported "ongoing difficulties with relationships, mood management, and feeling motivated," despite medication compliance. (AR, Doc. No. 7 at PageID 583.) Although Plaintiff told Nurse Louk in December 2022 that he was doing "better" with medication, he nevertheless complained of depression. (*Id.* at PageID 399.) Plaintiff also reported one explosive outburst since the prior visit. (*Id.*) Nurse Louk made no changes to Plaintiff's medications or dosages. (*Id.* at PageID 401.)

In January 2023, Plaintiff reported having "ongoing conflict with some important people in his life and struggling to communicate effectively with them and solve issues in healthy manners." (AR, Doc. No. 7 at PageID 578.) Plaintiff told his case manager in January 2023 that he became "very anxious when out in public especially when speaking or ordering anything." (*Id.* at PageID 576.)

During a telehealth visit with Nurse Louk in January 2023, Plaintiff said he had missed taking his medication for more than five days and asked to start a different one. (AR, Doc. No. 7 at PageID 434.) Plaintiff denied feeling depressed or "overly anxious" but reported "a few mood swings here and there," as well as "[two] or [three] outbursts" after he stopped taking his medication. (*Id.*) Nurse Louk prescribed Abilify for Plaintiff's impulse control and mood symptoms. (*Id.* at PageID 436.)

At a follow-up visit with Nurse Louk in February 2023, Plaintiff reported that he was taking and doing "good" on his current medications. (AR, Doc. No. 7 at PageID 439.) Plaintiff also described a "good" mood and denied feeling depressed or anxious. (*Id.*) In March 2023, Plaintiff told his therapist that his living situation was causing him increased anxiety and depression. (*Id.* at PageID 562.)

During the consultative psychological evaluation in March 2023, Plaintiff told Sudhir Dubey, Psy.D. that his anxiety was triggered by "things like 'job interviews,' 'feeling rushed,' and 'important situation[-]type stuff.'" (AR, Doc. No. 7 at PageID 419.) Plaintiff stated that he "'explodes' in circumstances such as job interviews," and also "becomes 'quiet' and 'not sure what to say.'" (*Id.* at PageID 423.) Plaintiff said that he quit his last job at a pizza restaurant because "they were not paying enough," but also said that he had "not worked [a] regular job because of anxiety." (*Id.* at PageID 421.)

Dr. Dubey reported that Plaintiff's scores on intelligence testing were in the extremely low range and diagnosed a mild intellectual disability. (AR, Doc. No. 7 at PageID 422-24.) Plaintiff described his mood as "good" and Dr. Dubey noted that he "presented as calm, appropriate[,] and stable." (*Id.* at PageID 419, 424.) Dr. Dubey

10

documented relatively normal findings such as appropriate dress, calm and stable behavior, appropriate eye contact, logical thought processes, unremarkable speech, no need for words or directions to be explained, full orientation, no attention problems, unremarkable recall, and no need for repetition of multi-step directions or questions. (*Id.* at PageID 421-22.)

Plaintiff told his case manager in April 2023 that he was doing "pretty good" but was "still trying to maintain his mouth and temper towards [his] girlfriend's family." (AR, Doc. No. 7 at PageID 560.) Plaintiff also told his therapist in April 2023 that he was "under stress and pressure" because of his living situation. (*Id.* at PageID 557.)

On May 1, 2023, Plaintiff told Nurse Louk that he was taking his medications as prescribed, was doing "alright," and was not feeling anxious or overly depressed. (AR, Doc. No. 7 at PageID 443.) Although Plaintiff denied experiencing outbursts, his mother said: "[H]e's been having a little bit more outbursts, not a lot but a little." (*Id.*) Later that month, Plaintiff denied any "aggressive acts on his part" but said that he remained "easily irritated at times." (*Id.* at PageID 544.)

In June 2023, Plaintiff said he was "doing pretty well," living at his girlfriend's house and "trying to maintain his anger at some of her family members." (AR, Doc. No. 7 at PageID 536.) The next month, Plaintiff told his case manager that he was "pretty good" and his emotions were "in check." (*Id.* at PageID 530.) Plaintiff also told Nurse Louk in July 2023 that he was doing "pretty good" on his current course of medications. (*Id.* at PageID 526.) He denied feeling overly anxious or overly depressed, and he reported "infrequent outbursts." (*Id.*) Plaintiff's mother stated: "[O]verall, he's doing a lot

11

better on the medication." (*Id.*) During case management visits later that month and in August 2023, Plaintiff complained of some depression but attributed it to his living situation. (*Id.* at PageID 520, 524.)

In October 2023, Plaintiff told Nurse Louk that he was "alright" but complained that his mood had been "back and forth … between feeling good and feeling anger." (AR, Doc. No. 7 at PageID 510.) He reported that he had been punching inanimate objects to "get rid of" his anger. (*Id.*) Nurse Louk documented anhedonia, anxiousness, and poor insight and judgment. (*Id.* at PageID 511.) He increased Plaintiff's dosage of Abilify. (*Id.*) Later that month, primary care physician Dr. Fuerst noted that Plaintiff exhibited a normal mood and normal behavior. (*Id.* at PageID 460.)

In November 2023, Plaintiff told his case manager that he was doing "ok[ay]" but was still trying to control his temper. (AR, Doc. No. 7 at PageID 506.) That same month, Plaintiff told Nurse Louk that his medication was helping, and his mood was "alright" although he felt "sort of" depressed and anxious. (*Id.* at PageID 500.) Plaintiff also said that his anger outbursts (described as "hitting objects with intent to cause personal pain to elevate anger") had improved from daily to "only weekly." (*Id.*) Nurse Louk increased Plaintiff's Abilify dosage. (*Id.* at PageID 501.) Plaintiff also saw his therapist in November 2023 and reported "significant periods of depression" with his only coping mechanism being medications that only partially helped to relieve his symptoms. (*Id.* at PageID 498.) Plaintiff reported increased depression and anxiety during his next therapy session in December 2023. (*Id.* at PageID 496.)

12

Plaintiff told his case manager in January 2024 that he was a "little depressed lately but not a lot." (AR, Doc. No. 7 at PageID 492.) He told Nurse Louk in January 2024 that his depression had worsened, his mood had been "poor," and he had been anxious. (*Id.* at PageID 486.) Plaintiff said his anger outbursts had reduced in frequency to "once or twice a month." (*Id.*) Nurse Louk recommended an antidepressant medication but Plaintiff said that he wanted to try vitamin D supplementation. (*Id.* at PageID 490.)

On many occasions during this time, progress notes from Nurse Louk and Plaintiff's therapist document depressed, dysphoric, and/or anxious moods, anhedonia, a flat or blunted affect, limited to poor insight, and fair to poor judgment. (*See* AR, Doc. No. 7 at PageID 397, 401, 435, 439, 446, 475, 489, 500, 527-28, 562, 568, 578, 581, 583, 585, 591, 593.) Plaintiff's providers documented an appropriate affect and adequate insight on far fewer occasions. (*See, e.g., id.* at PageID 436, 439, 528.) Other mental status findings were generally unremarkable and included an appropriate appearance, cooperative behavior, no agitation, clear and coherent thoughts, no abnormalities of thought content, and normal attention span and concentration. (*Id.* at PageID 397, 401, 435-36, 439, 446, 511, 528, 568, 578, 581, 585, 591, 593.)

In February 2024, Plaintiff told his case manager that he was doing "pretty good" and his depression was "better." (AR, Doc. No. 7 at PageID 482.) Later that month, he told his therapist that he had "significant anger and frustration" with his living situation and "his life at this point." (*Id.* at PageID 481.)

In March 2024, Plaintiff reported continued stress and said that he often struggled to alleviate his symptoms. (AR, Doc. No. 7 at PageID 478.) A few weeks later, Plaintiff

13

told Nurse Louk that his mood had been "chill" since starting vitamin D supplementation. (*Id.* at PageID 472.) Plaintiff's mother confirmed that Plaintiff had been "way calmer" and appeared to be less depressed (*Id.*) However, Plaintiff said his anxiety had continued and only minimally improved with Hydroxyzine (Vistaril).[6] (*Id.*) A mental status examination again showed anhedonia, anxiousness, and an inappropriate and blunted affect. (*Id.* at PageID 475.) Nurse Louk increased Plaintiff's Vistaril dosage. (*Id.*)

Plaintiff told his providers in April and May 2024 that he was feeling more anxious and less motivated. (AR, Doc. No. 7 at PageID 599, 601.)

At Plaintiff's next—and most recently documented—visit with Nurse Louk in June 2024, Plaintiff said that his medications were helpful and that the increased Vistaril dose had been "effective" to manage his anxiety. (AR, Doc. No. 7 at PageID 603.). He denied feeling depressed or anxious "unless he forgets to take his medication." (*Id.*) Plaintiff's mother told Nurse Louk that Plaintiff was "[s]uper-pleasant" to be around unless he forgot to take his medications. (*Id.*) Nurse Louk documented normal mental status findings, including an appropriate mood and affect. (*Id.* at PageID 606.)

### 3. The ALJ's decision

The ALJ summarized the hearing testimony from Plaintiff and his mother, as well as Plaintiff's claimed symptoms, reported daily activities, and subjective complaints during his medical appointments. (Decision, Doc. No. 7 at PageID 45-46.) The ALJ

---

[6] Vistaril is a brand name of Hydroxyzine. *Hydroxyzine*, https://www.mayoclinic.org/drugs-supplements/hydroxyzine-oral-route/description/drg-20311434 [https://perma.cc/2ZAW-2HC5] (last visited June 11, 2026).

acknowledged Plaintiff's testimony regarding his difficulty with anger management and his outbursts but stated: "He reported improved frequency for these episodes, however." (*Id.* at PageID 46.) The ALJ concluded that although Plaintiff's medically determinable impairments could reasonably be expected to cause some of his symptoms, the statements about "the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record ….". (*Id.* at PageID 45-46 (citing 20 C.F.R. § 404.1529 and Social Security Ruling (SSR) 16-3p).)

Next, the ALJ summarized the mental health progress notes. (Decision, Doc. No. 7 at PageID 47-48.) The ALJ acknowledged that Plaintiff was diagnosed with "intermittent explosive disorder, associated with anger outbursts disproportionate to the provocation." (*Id.* at PageID 47.) The ALJ stated that mental status examinations conducted between October and December 2022 showed depression with poor insight and judgment but were otherwise normal. (*Id.* at PageID 47-48 (citing AR, Doc. No. 7 at PageID 386-402).) The ALJ also cited an October 2023 primary care note that documented normal mental status findings. (*Id.* at PageID 48 (citing AR, Doc. No. 7 at PageID 459-60).)

The ALJ then summarized Plaintiff's subjective complaints to his providers and cited several references to improvement in Plaintiff's symptoms, as follows:

- Follow-up notes in October and December [of 2022], show that [Plaintiff's] symptoms and behavior improved with medications and therapy. He denied depression, but reported anxiety. He also continued to smoke marijuana daily despite repeated recommendation to stop. Nevertheless, both [Plaintiff] and his mother acknowledged improvement overall with treatment;

15

- [Plaintiff's] symptoms further improved once new medications were restarted. He exhibited poor insight with an otherwise intact mental status exam. This remained largely stable through May 2023;

- Two months later [in July 2023], [Plaintiff's] mood and function were reportedly good without significant anxiety or depression. He was able to go to the store alone. His mother also acknowledged that [Plaintiff] was "doing a lot better on medication";

- Case management and therapy notes through 2023 and 2024 generally reflect improvement in terms of symptoms and functioning;

- By January 2024, he reported infrequent angry outbursts, once or twice per month, and reported overall improved mood and functioning. [Plaintiff] reported further improved mood with vitamin D supplement. Indeed, his mother also acknowledged that [Plaintiff] was "way calmer" in March [2024].

- His anxiety and depression were fairly well controlled when compliant with medication. His mother again acknowledged this [in June 2024] stating that [Plaintiff] was "doing a lot better with medication" and "[s]uper-pleasant to be around unless he forgets to take his medication."

(*Id.* at PageID 47-48.)

Next, the ALJ explained how the medical evidence supported his decision to include certain restrictions in the RFC:

> The above evidence supports the ability to perform work with reduced complexity given [Plaintiff's] cognitive deficits (i.e., simple tasks). He is also able to maintain attention and concentration for at least two-hour segments, given the largely intact mental status examinations without notable signs of inattention or concentration deficits. However, he is further limited in terms of productivity and pace given [Plaintiff's] reduced stress tolerance and cognitive deficits (i.e., not involving fast production rate, such as fast assembly line pace). He can tolerate occasional interaction with others but is unable to perform team or tandem work given his documented anxiety and irritability issues. He can perform work with reduced novelty demands to account for limited stress tolerance (i.e., occasional changes at the worksite).

(Decision, Doc. No. 7 at PageID 48.)

16

Addressing Plaintiff's subjective complaints, the ALJ concluded that the severity of Plaintiff's alleged symptoms was "inconsistent with the greater weight of the evidence." (Decision, Doc. No. 7 at PageID 48.) The ALJ acknowledged Plaintiff's alleged anger outbursts but found that "[t]he evidence does not support the frequency of anger or explosive outbursts as alleged by [Plaintiff]." (*Id.*) The ALJ explained:

> [Plaintiff's] prior employer indicated that outbursts resulted in termination, but did not give specific accounts regarding the nature, frequency, or severity of alleged outbursts (Exhibit 11E). His mother also reported frequent outbursts, yet [Plaintiff] consistently appears cooperative, pleasant, appropriate, and/or stable notwithstanding symptoms (*see* Exhibits 3F, 4F, 5F, 8F, 9F, 10F, 11F). He appeared irritable on occasion (*see e.g.*, Exhibits 3F/24; 9F/35); however, never exhibited inappropriate behavior suggestive of explosive or aggressive outbursts. He went out in the community with his case manager without notable limitation, as he appeared polite, pleasant, and appropriate (see Exhibits 8F-10F). He was calm, appropriate, and stable during the consultative psychological evaluation (Exhibit 4F). His mother also acknowledged improvement with treatment at various appointments (*see e.g.*, Exhibits 5F/12; 8F/1; 11F/1). Her allegations are likewise not consistent with school records, which do not describe significant mood or behavior issues since childhood (*see e.g.,* Exhibits 1F/5F, 23-24).

(*Id.* at PageID 48-49.)

The ALJ also concluded that Plaintiff's treatment was "routine and conservative, but effective." (Decision, Doc. No. 7 at PageID 49.) The ALJ reasoned:

> Minimal progress is often noted by his case manager, yet the narrative summaries typically reflect improved mood and functioning and better control of anger and outbursts. His mood was typically affected by stress, such as his living situation and denial of his disability claim, but generally, he exhibits improved mood and stress management (Exhibits 8F, 9F, 10F). He frequently acknowledged improved symptoms with appropriate treatment, as discussed above. The evidence also shows noncompliance with treatment, but does not indicate that [Plaintiff's] cognitive deficits impaired his ability to comply with treatment. He consistently reported improved symptoms and function with medication. Moreover, [Plaintiff] did not stop marijuana use despite repeated recommendations by medical

17

providers and provided contradictory statements regarding drug use (Exhibit 5F/12; see also Exhibits 3F, 5F, 8F).

(*Id.*)

The ALJ concluded that the RFC "is supported by school records, mental status exams, treatment records, IQ testing, the reviewing psychologists' assessments, and Dr. Dubey's exam and opinion." (Decision, Doc. No. 7 at PageID 50-51.)

## IV.    LAW AND ANALYSIS

For his sole assignment of error, Plaintiff states that the ALJ's decision "is not based on substantial evidence, particularly as it relates to the Plaintiff's severe impairment of intermittent explosive disorder." (SE, Doc. No. 11 at PageID 628.) He contends that the ALJ's reasoning—that the frequency and severity of Plaintiff's anger outbursts improved with treatment—is "flawed as it fails to accurately consider the Plaintiff's treatment, the frequency of the Plaintiff's outbursts despite this treatment, and the ongoing and persistent nature of his symptoms of Intermittent Explosive Disorder." (*Id.* at PageID 628-29.) For the reasons set forth below, the undersigned Magistrate Judge finds this alleged error to be well-taken and therefore recommends that the District Judge reverse the ALJ's decision and remand this matter to the Commissioner.

### A.    Applicable Law

Determination of the RFC is a task reserved for the ALJ. 20 C.F.R. § 404.1546(c); *see also Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004) ("[T]he ALJ is charged with the responsibility of evaluating the medical evidence and the claimant's testimony to form an 'assessment of his [RFC]'"). A claimant's RFC describes the most

18

he can do in a work setting despite his physical and mental limitations. 20 C.F.R. § 404.1545(a)(1). When formulating the RFC, the ALJ must consider the claimant's "ability to meet the physical, mental, sensory, and other requirements of work." 20 C.F.R. § 404.1545(a)(4). The ALJ must base the RFC on all relevant evidence in the record, including the claimant's descriptions of his limitations and symptoms, objective medical evidence, medical opinions, other medical evidence, evidence from non-medical sources, and prior administrative medical findings. *See* 20 C.F.R. § 404.1545(a)(1)-(5).

Notably, an ALJ is required to consider evidence from the entire relevant time period when formulating the RFC. *E.g., White v. Comm'r of Soc. Sec.*, No. 3:21-cv-762, 2022 U.S. Dist. LEXIS 140674, *47 (N.D. Ohio June 1, 2022) (Knapp, M.J.), *affirmed by* 2022 U.S. Dist. LEXIS 139178 (N.D. Ohio Aug. 4, 2022) (Knepp, D.J.). As Magistrate Judge Knapp explained, "[w]hile the substantial evidence standard is deferential, the Sixth Circuit has emphasized that the chief limitation to that deference 'is the requirement that all determinations be made based upon the record in its entirety.'" 2022 U.S. Dist. LEXIS 140674, *47 (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 249 (6th Cir. 2007)). Thus, an ALJ should not "unduly concentrate on one single aspect of the claimant's history." *Rogers*, 486 F.3d at 249.

Further, an ALJ is required "to show his or her work." *Scott K. v. Comm'r of the SSA*, No. 3:21-CV-00129, 2022 U.S. Dist. LEXIS 175673, at *11 (S.D. Ohio Sept. 27, 2022) (Silvain, M.J.) (internal citation omitted). Thus, "[t]his Court cannot uphold an ALJ's decision, even if there if there is enough evidence in the record to support the decision, where the reasons given by the trier of fact do not build an accurate and logical

19

bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (cleaned up) (internal quotations and citation omitted). *See also Danyel P. v. Comm'r of Soc. Sec.*, No. 2:21-CV-02405, 2022 WL 1514170, at *6 (S.D. Ohio May 13, 2022) (Preston Deavers, M.J.) (ALJ's "inexplicable and illogical consistency" warranted remand); *Kimberly S. v. Comm'r of Soc. Sec.*, No. 3:21-CV-00310, 2022 WL 17820565, at *3 (S.D. Ohio Dec. 20, 2022) (Silvain, M.J.) (ALJs must "provide a coherent explanation of [their] reasoning ... in order to provide sufficient rationale for a reviewing adjudicator or court"); *Hardiman v. Comm'r of Soc. Sec.*, No. 2:12-CV-00508, 2013 WL 3762266, at *5 (S.D. Ohio July 16, 2013) (Preston Deavers, M.J.) (remanding case on the ground that "the ALJ's decision is internally inconsistent and incomplete").

Finally, the Court recognizes that the ALJ is not required to directly address each and every piece of evidence and finding in the record. *See Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 437 n.11 (6th Cir. 2014). Nevertheless, the ALJ's "factual findings as a whole must show that [he] implicitly resolved" any conflicts in the evidence. *Id.* The failure to address evidence when evaluating a claimant's symptom severity may signify an impermissibly selective review of the record. *E.g.*, *Minor v. Comm'r of Soc. Sec.*, 513 Fed. App'x 417, 435 (6th Cir. 2013) (reversing where "[i]nstead of performing a proper analysis … the ALJ cherry-picked select portions of the medical record to discredit Minor's complaints of pain").

20

**B.      The ALJ's Conclusions Are Unsupported by Substantial Evidence.**

The ALJ concluded that Plaintiff's mental health impairments were not disabling after finding that: (1) "[t]he evidence does not support the frequency of anger or explosive outbursts as alleged by the [Plaintiff];" and (2) "[Plaintiff] frequently acknowledged improved symptoms with appropriate treatment …. He consistently reported improved symptoms and function with medication." (Decision, Doc. No. 7 at PageID 48-49.) These findings are not supported by substantial evidence. The record shows that Plaintiff required adjustments to his medications over a long period of time and continued to exhibit and complain of symptoms despite those medication changes. Because the ALJ impermissibly minimized or overlooked contradictory evidence, the undersigned recommends that the ALJ's decision be reversed and remanded.

Most significantly, the ALJ inexplicably ignored numerous progress notes dated through March 2024 that consistently documented depressed, dysphoric, and/or anxious moods, anhedonia, a flat or blunted affect, poor insight, and fair to poor judgment. (*See* AR, Doc. No. 7 at PageID 397, 401, 435, 439, 446, 475, 489, 500, 527-28, 562, 568, 578, 581, 583, 585, 591, 593.) Instead, the ALJ cited only three progress notes with abnormal mental status findings—all of which were dated between October and December 2022—as well as one progress note from October 2023 with normal findings. (Decision, Doc. No. 7 at PageID 47-48.) Rather than resolve conflicts in the evidence, the ALJ's summary provides an incomplete and misleading picture of Plaintiff's mental status evaluations during the entire relevant time period (not just 2022-2023).

The ALJ also minimized Plaintiff's complaints to his providers regarding his anxiety and anger symptoms. For example, the ALJ stated that in October and December 2022, "both [Plaintiff] and his mother acknowledged improvement overall with treatment." (Decision, Doc. No. 7 at PageID 47.) While that statement is true, it is also incomplete. The ALJ did not acknowledge Plaintiff's statement that he "frequently" felt anxious, or the fact that he was prescribed Vistaril for his anxiety. (*Id.* at PageID 397.) The ALJ also did not acknowledge Plaintiff's statement in November 2022 that he had "ongoing difficulties with relationships, mood management, and feeling motivated." (*Id.* at PageID 583.)

The ALJ did acknowledge Plaintiff's report of "two to three outbursts" in January 2023. (Decision, Doc. No. 7 at PageID 47 (citing AR, Doc. No. 7 at PageID 434).) However, the ALJ inaccurately attributed these outbursts to "noncompliance with medication" when in fact, Plaintiff reported that he had run out of Lamotrigine. (*Compare* Decision, Doc. No. 7 at PageID 47, *with* AR, Doc. No. 7 at PageID 434.)

Summarizing further, the ALJ stated: "[Plaintiff's] symptoms further improved once new medications were restarted. … This remained largely stable through May 2023. … Two months later, [Plaintiff's] mood and function were reportedly good without significant anxiety or depression. … His mother also acknowledged that [Plaintiff] was 'doing a lot better on medication.'" (Decision, Doc. No. 7 at PageID 47.) This summary omits inconsistent evidence in the record. For example, in May 2023, Plaintiff's mother reported his girlfriend's statement that Plaintiff was having more anger outbursts. (AR,

22

Doc. No. 7 at PageID 443.) Plaintiff also told his therapist that he "remains easily irritated at times," although he denied any "aggressive acts." (*Id.* at PageID 544.)

Continuing his summary, the ALJ stated: "Case management and therapy notes through 2023 and 2024 generally reflect improvement in terms of symptoms and functioning… [Plaintiff] did not endorse frequent anger outbursts or significant mood symptoms (Exhibits 8F, 9F)." (Decision, Doc. No. 7 at PageID 48.) And in his analysis of symptom severity, the ALJ similarly found that Plaintiff "consistently reported improved symptoms and function with medication." (*Id.* at PageID 49.) Again, these statements ignore inconsistent evidence in the record. In October 2023, Plaintiff stated that the medications were "helpful" but also said that his mood was "back and forth" and he was "alternating between feeling good and feeling anger." (AR, Doc. No. 7 at PageID 510.) Indeed, Plaintiff admitted to "punching inanimate objects, which hurts him 'to get rid of' his anger.'" (*Id.*) At that time, Nurse Louk increased Plaintiff's Abilify dosage to address his impulse control and mood issues. (*Id.* at PageID 511.) The ALJ ignored this evidence.

The following month, Plaintiff told Nurse Louk that he was still experiencing some depression and anxiety. (AR, Doc. No. 7 at PageID 500.) And while Plaintiff reported that his anger outbursts had improved and he was no longer having daily outbursts, he nevertheless reported having outbursts on a ***weekly*** basis. (*Id.* (emphasis added).) Nurse Louk again increased Plaintiff's Abilify dosage. (*Id.* at PageID 501.) Plaintiff told his therapist later that month that his medications only partially relieved his symptoms. (*Id.* at PageID 498.) The ALJ did not consider this inconsistent evidence.

23

In January 2024, Plaintiff said his medications were "helpful" and he had fewer outbursts, although he still reported having one to two anger outbursts per month. (AR, Doc. No. 7 at PageID 486.) He also reported anxiety and increased depression. (*Id.*) In March 2024, Plaintiff told Nurse Louk that although medications were "helpful," his anxiety was only "minimally improved" with Vistaril. (*Id.* at PageID 472.) Nurse Louk increased Plaintiff's Vistaril dosage. (*Id.* at PageID 475.) Not until June 2024 did Plaintiff deny significant symptoms and report that the increased Vistaril dosage was effective for managing his anxiety. (*Id.* at PageID 603.)

The ALJ also minimized Plaintiff's testimony about his anger outbursts. The ALJ acknowledged Plaintiff's testimony that he has anger management issues, "becomes loud and sometimes punched walls," and is triggered by "people not understanding what he was trying to say." (Decision, Doc. No. 7 at PageID 46.) However, the ALJ also stated that Plaintiff "reported improved frequency for these episodes." (*Id.*) While Plaintiff did testify that the episodes had become less frequent, the ALJ did not acknowledge his testimony that he continued to have outbursts "about maybe, maybe *weekly*." (AR, Doc. No. 7 at PageID 79 (emphasis added).) The ALJ also did not acknowledge Plaintiff's testimony that it usually took "[a]n hour or two" to "calm back down" by going outside for a walk, listening to music, or playing video games. (*Id.*)

In sum, although Plaintiff's mental status examinations showed some normal findings and he sometimes did better on medications, the record also shows that his symptoms improved unevenly and sporadically, he required many adjustments to his medications, and he continued to experience depression, anxiety, anger and outbursts

even while taking his medications. Further, his mental status examinations often showed depressed, dysphoric, and/or anxious moods, anhedonia, a flat or blunted affect, limited to poor insight, and fair to poor judgment. The ALJ's failure to acknowledge and account for significant evidence that supports Plaintiff's subjective complaints about his mental health impairments signifies an impermissibly selective review of the record. *See Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 723-24 (6th Cir. 2014) ("[A]lthough the ALJ stated that she considered all the medical evidence … her reasoning shows that she discounted the severity of Gentry's conditions—based on periodic improvements and cessation of treatment—by failing to address certain portions of the record"); *Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 435 (6th Cir. 2013) ("Instead of performing a proper analysis … the ALJ cherry-picked select portions of the medical record to discredit Minor's complaints of pain"); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (ALJ erred by "parsing the various medical reports").

The undersigned is unpersuaded by Defendant's assertion that "Plaintiff's argument is little more than a recitation of the evidence most beneficial to his disability application with a request that this Court conduct a de novo review of the evidence in his favor." (Mem. In Opp., Doc. No. 12 at PageID 634 (citing *Blakley*, 581 F.3d at 406; 399; *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 648 (6th Cir. 2011).) The undersigned recognizes that the ALJ need not discuss each and every piece of evidence and finding in the record. *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 437 n.11 (6th Cir. 2014). Nevertheless, the ALJ's "factual findings as a whole" must show that he "implicitly resolved the conflicts in the evidence." *Id.* Here, the ALJ's apparent failure to

25

acknowledge the ongoing difficulties that Plaintiff experienced despite continued changes to his medication regimen shows that the ALJ did not implicitly resolve the conflicts in the evidence. Instead, the ALJ's apparent failure to consider significant evidence that contradicts his conclusions signifies an impermissibly selective review of the record. Accordingly, the undersigned recommends reversal.

## V.    REMAND

Under Sentence Four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under Sentence Four may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking. *Faucher v. Sec'y of Health & Human Servs.,* 17 F.3d 171, 176 (6th Cir. 1994).

The undersigned concludes that a judicial award of benefits is unwarranted in the present case because the evidence of disability is neither overwhelming nor strong while contrary evidence is lacking. *Faucher*, 17 F.3d at 176. Therefore, the undersigned recommends that the District Judge issue an Order remanding this case to the Social Security Administration pursuant to Sentence Four of Section 405(g) for the reasons stated above. On remand, the ALJ should further develop the record as necessary, particularly as to Plaintiff's intermittent explosive disorder, and evaluate the evidence of record under the applicable legal criteria mandated by the Commissioner's regulations

26

and rulings and governing case law. The ALJ should evaluate Plaintiff's disability claim under the required five-step sequential analysis to determine anew whether Plaintiff was under a disability and whether his applications for Disability Insurance Benefits and Supplemental Security Income should be granted.

**IT IS THEREFORE RECOMMENDED THAT**:

1.      Plaintiff's Statement of Errors (Doc. No. 11) be GRANTED;

2.      The Court REVERSE the Commissioner's non-disability determination;

3.      No finding be made as to whether Plaintiff was under a "disability" within the meaning of the Social Security Act;

4.      This matter be REMANDED to the Social Security Administration under Sentence Four of 42 U.S.C. § 405(g) for further consideration consistent with this Decision and Order; and

5.      This case be terminated on the Court's docket.

*s/ Caroline H. Gentry*
Caroline H. Gentry
United States Magistrate Judge

**DEADLINE TO FILE OBJECTIONS**

In accordance with Rule 72(b)(2) of the Federal Rules of Civil Procedure, any party may file and serve specific written objections to this Report and Recommendation ("R&R") **within fourteen (14) days** after being served with a copy. A party may respond to another party's objections **within fourteen (14) days** after being served with a copy. If necessary, the objecting party must promptly arrange for transcribing the record, or whatever portions of it to which the parties agree or the Magistrate Judge considers

27

sufficient. If proper objections are timely filed, then the District Judge will conduct a de novo review of the challenged portion(s) of the R&R. Failure to file timely objections may forfeit rights on appeal. *See U.S. v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).